**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GREGORY ALAN JOHNSON,

               Petitioner,

      v.

JAMES A. YATES, Warden,

               Respondent.

_____/

No. C 06-3257 SI (pr)

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS**

**INTRODUCTION**

      Gregory Alan Johnson, an inmate at Pleasant Valley State Prison in Coalinga, California, filed this pro se petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  For the reasons discussed below, the petition will be denied.

**BACKGROUND**

A.    <u>The Crimes</u>

      The evidence relating to the murder and robbery was described in the California Court of Appeal's decision:

          In August of 1999, defendant was released from a "penal institution" in Colorado.  Before his release, defendant wrote to his friend Harry Campbell, who lived in San Francisco.  Defendant asked Campbell to send him "dress-out clothes" and money for a bus ticket to San Francisco.  Campbell complied with

1    both requests.

2          Defendant arrived in San Francisco in the early morning on September 11,
     1999. That day, defendant visited Campbell. During the visit, defendant's friend
3    Clay Catlin called Campbell's apartment, looking for defendant. Defendant and
     Catlin spoke and made plans to meet that day.
4
          . . . .
5
6          The evening of September 12, 1999 was the last time that the victim,
     Renato Dy, was heard from. Dy spoke to his aunt, Elsie Silva, on the telephone
7    at about 9:00 p.m. that night. At the time, Dy was in Emeryville, shopping at
     Circuit City with his cousin.
8
          On Monday, September 13, 1999, defendant briefly met up with his friend
9    Maurice Ray Sherer, who lived in San Francisco. Defendant was driving a car
     that he claimed belonged to his uncle. In fact, the car belonged to Dy.
10
          On Tuesday, September 14, 1999, defendant met Sherer in Golden Gate
11   Park. Sherer and defendant drank some beer together, then drove to Pier 39 at
     Fisherman's Wharf. Defendant asked Sherer to buy a radio from him. The radio
12   was in the trunk of the car along with a "bunch of junk." Sherer gave defendant
     $ 7.00 for the radio.
13
          Defendant told Sherer that "he had killed a man." Defendant described
14   strangling the man with a belt "or something," gesturing to demonstrate how he
     had done it. Sherer "laughed it off" because he considered defendant "a
15   storyteller." Sherer did notice that defendant had some scratches on his hand, but
     thought that "it looked like paper cuts." Defendant told Sherer that "somebody
16   was with him" during the incident.

17         Sherer believed that defendant was gay; he knew that defendant hung out
     with gay men. In the past, defendant had hung out in the Polk Street area of San
18   Francisco. He would return from the area with money. Sherer believed that
     defendant had been "prostituting himself," although defendant claimed "that he was
19   robbing gay people."

20         On Wednesday, September 15, 1999, Dy's employer called Silva, reporting
     that Dy had not come or called in to work. Silva telephoned Dy's apartment but
21   there was no answer or answering machine. Silva then went to Dy's San Jose
     apartment. Dy's brother, Robert, came along.
22
23         Silva and Robert arrived at Dy's apartment at about 11:00 a.m. The
     apartment was locked and there was no answer when they knocked on the door.
24   They contacted a neighbor, who in turn contacted the apartment manager. The
     apartment manager opened the door to Dy's apartment. . . . Robert discovered Dy's
25   body in the bathroom.

26
27         San Jose police officers responded to the scene. . . . Dy had apparent
     ligature marks on his neck, and the police found a belt and white electrical cord that
     had a blood stain on it.
28

United States District Court
For the Northern District of California

2

The police noticed a number of items with apparent evidentiary significance. There was a t-shirt purchased from Costco with a stain on it. There was a small black suitcase, which had its locks forced open. There was a box for a new NewTech brand radio, but no radio. There was no telephone, although there appeared to have been one in the apartment at some previous time. There was a used condom in the garbage can of the bathroom.

An autopsy was performed on Dy's body. The coroner determined that the cause of Dy's death was ligature strangulation, consistent with either the electrical cord or, more likely, the belt. A stab wound to Dy's neck was "a contributing factor in death," but "it was not the major factor." The coroner estimated the time of Dy's death as between the evening of Sunday, September 12, 1999, and the following morning.

. . . .

Telephone records from Dy's apartment indicated that three calls were placed between 10:12 p.m. and 10:15 p.m. on Sunday, September 12, 1999. These calls were to one of defendant's relatives in Oklahoma, to defendant's girlfriend in Colorado, and to defendant's mother in Southern California.

**Defendant's Arrest and First Interview**

On September 16, 1999, at about 7:00 p.m., a sergeant with the Routt County, Colorado, Sheriff's Office initiated a traffic stop of defendant, who had been speeding while driving Dy's car. During the stop, dispatch informed the sergeant that there was "a felony hit" on the vehicle, indicating that someone associated with the vehicle was wanted for a felony. The sergeant requested backup and requested the dispatcher contact the San Jose Police Department. Defendant was arrested. He told the sergeant that his "friend Rudy Dy" had let him use the car to drive to Colorado.

Detective Louie Hill interviewed defendant in Colorado on September 18, 1999. He first read defendant the Miranda admonitions. Miranda v. Arizona, 384 U.S. 436 (1966). Defendant said he had met Dy on the afternoon of Saturday, September 11, 1999, on Polk Street in San Francisco. Defendant and Dy drove to San Jose that day at around 4:00 p.m. On Sunday, September 12, 1999, defendant and Dy drove to Costco, where Dy purchased some clothes for defendant. Defendant and Dy then drove back up to San Francisco, arriving at about 5:00 p.m. Dy offered to lend defendant the car so that defendant could return to Colorado, as defendant could not afford a plane ticket. Defendant accepted Dy's offer to lend him the car. Dy said he would take the Cal Train back to San Jose. Defendant last saw Dy at about 5:30 p.m. that day. Defendant denied returning to San Jose that night, and he denied killing Dy. Defendant claimed he spent a few more days in San Francisco and then drove back to Colorado.

Detective Hill knew that defendant's story conflicted with the statements of Dy's family, who claimed to have seen Dy alone in his car the night of Sunday, September 12, 1999. He also knew that defendant's story conflicted with the statement of Dy's neighbor, who had seen Dy's car outside his apartment at 5:15 a.m. on Monday, September 13, 1999.

Detective Hill noticed cuts and lacerations on defendant's hands. Defendant said that he had cut his right forefinger on a Pepsi can. He had obtained a blister

3

on the palm of his hand at work before he left Colorado. He had cut his ring finger or his pinky finger while on the bus from Colorado. He could not explain one or two other cuts.

**Defendant's Second Interview**

On November 4, 1999, defendant was interviewed a second time, by Detective Hill and Sergeant Armando Real-Vasquez. Defendant asserted that he had "no part" in Dy's death, but admitted he was present when Dy was killed. Defendant initially refused to name the person who had killed Dy, but he eventually said Clay Catlin had committed the murder.

Defendant explained that he had met Catlin in prison in Colorado. Defendant had told Catlin how he "used to rob gay men because they probably wouldn't go to the police because they were lookin[g] to pick up people, anyway." Catlin was interested in doing the same thing, so defendant showed him where to go in San Francisco. On Saturday, September 11, 1999, Dy approached them and offered to buy them something to eat. Dy also bought some undershirts and boxers for defendant. Defendant and Catlin ended up spending the night at Dy's apartment. Catlin and Dy slept in the lower bunk bed together; they were "messin' around" while watching a pornographic videotape. Defendant slept in the upper bunk. At some point during the night, defendant and Catlin left and drove around for a while. Defendant cut his finger while smoking marijuana.

The next day, Sunday, September 12, 1999, Dy bought defendant some clothes at Costco. All three men then drove back to San Francisco. Dy dropped defendant and Catlin off while he went to Emeryville. Dy later returned to pick up defendant and Catlin, then drove them back to his apartment again.

Defendant asked Dy if he could borrow Dy's car to drive back to Colorado. Dy agreed. Defendant made a few telephone calls, then took the car and left. He went back to San Francisco. On Monday, Catlin appeared in San Francisco. Catlin said he wanted to return to Colorado and told defendant, "you gotta get rid of the car." Defendant asked "why," but Catlin would not tell him. Catlin showed defendant some credit cards. Defendant asked where Catlin had obtained them, but Catlin would not tell him. Later, Catlin gave defendant one of the credit cards and defendant saw Dy's name on it. Later that night, Catlin told defendant, " 'I killed him.' " Catlin stated that he had strangled Dy.

**Informant Riley Jones**

Riley Ralph Jones, an inmate in county jail, met defendant while both were in the maximum security portion of the jail. They communicated through holes in the door. Defendant also wrote some notes to Jones during his incarceration.

Defendant told Jones that he had "killed a man." Defendant said that he had met Dy and had gone to Dy's home to engage in sex. Defendant told Jones that there had been a struggle, and that he had stabbed and strangled Dy in the living room. Defendant told Jones that he had dragged Dy's body to the bathroom, where he cleaned Dy's fingernails and washed Dy's hands. Defendant claimed he committed the murder in order to take things from Dy. He claimed to have taken stereo equipment, telephones, jewelry, some money, and Dy's car. Defendant then went to San Francisco to try to sell some of the items, so he could get back to Colorado.

United States District Court
For the Northern District of California

1
2

When Jones asked defendant why he had killed Dy "for such a small amount," defendant replied " 'fuck that fagot.' "  Also at that point, defendant told Jones, "I didn't do it, I had a crimie," meaning he had a crime partner.

3
4

Jones conveyed some of this information in a letter to the prosecution, postmarked November 22, 1999. . . .

5
6
7
8

On September 1, 2000, Detective Hill performed [a] search of defendant's jail cell, pursuant to [a] search warrant.  He located a document that, according to defendant, contained Dy's written authorization allowing defendant use of his car.  The document was in defendant's handwriting.  Detective Hill also located typewritten versions of the document.  It was apparent that Dy's signature - obtained from sales receipts, which were also found in defendant's jail cell - had been taped on and that liquid paper had been used on the documents.

9

### Defendant's Trial Testimony

10
11
12

Defendant was charged with Dy's murder ( § 187) and first degree robbery ( §§ 211, 212.5).  Defendant, who was 23 years old at the time of trial, in April of 2001, testified in his own defense.  Catlin did not testify at trial.  Evidence was introduced indicating that defendant had instructed Catlin to invoke his Fifth Amendment privilege against self-incrimination if he was called to testify.

13
14

Defendant testified that he had lived in San Francisco, in 1997.  At that time, he had worked as a male prostitute, and he had worked for an escort service.  Defendant had met Dy during this time period.  Dy had been a "client"; defendant would "find somebody for him."

15
16
17
18

After returning to San Francisco on September 11, 1999, defendant showed Catlin where to get work as a male prostitute.  Defendant then ran into Dy, who asked if defendant had "anybody lined up for [him]."  Defendant told Dy about Catlin. Defendant and Dy drove around, but could not find Catlin.  Dy offered to let defendant stay at his apartment in San Jose, and defendant accepted.  On the way to San Jose, Dy bought some undershirts and boxer shorts for defendant.

19
20
21

At the apartment, defendant and Dy conversed until about 5:00 or 6:00 a.m.  Dy asked about defendant's plan to return to Colorado for his girlfriend's prom or homecoming.  Defendant said he planned to travel by bus because he could not afford a plane ticket.  Dy offered to buy defendant a plane ticket.  He made a telephone call and determined a ticket would cost about $ 800.  Dy then offered to lend defendant his car if defendant "hooked him up with Clay."

22
23
24
25

Defendant slept at Dy's apartment, in the top bunk of Dy's bunk bed.  The next day, Sunday, September 12, 1999, Dy and defendant returned to San Francisco.  On the way, Dy bought defendant some clothes.  In San Francisco, Defendant and Dy met up with Catlin.  Defendant told Catlin, "you said you wanted to make money, here is your opportunity."  Catlin and Dy spoke by themselves.  Dy said he had to go to Emeryville and that he would meet defendant and Catlin later that night.

26
27
28

At about 8:15 or 8:20 p.m., Dy arrived at the arranged meeting spot.  Defendant, Catlin, and Dy drove to San Jose.  Dy put on a pornographic videotape, then made arrangements to pay Catlin for oral sex.  Dy brought out a black suitcase and opened it.  It contained lubricant, condoms, and bondage ropes.  Dy wanted to tie Catlin up, but Catlin refused.  Defendant allowed Dy to tie him up instead, to

**United States District Court**
For the Northern District of California

show Catlin "that it was all right."  Defendant lay face-down on the bed.  Dy tied defendant's hands together and tied them to the bed post.  Dy left the room briefly and then came back, with only a t-shirt on.  Dy sat on top of defendant's legs; he had an erection.  Defendant tried to use his legs to push Dy off, but he was unable to do so.  He asked Dy, "'what are you doing?'"  Defendant told Dy "'get off me.'"  Instead, Dy started to pull defendant's pants down.

Defendant called for Catlin, who was in the other room.  Before Catlin arrived, Dy was able to pull defendant's pants down and began attempting to sodomize defendant.  Dy's penis contacted defendant's anus, but did not penetrate.  Catlin arrived and defendant said something like "'get this mother fucker off me.'"  Catlin pulled Dy off of defendant.  Catlin "put his hands around [Dy's] neck and rendered him unconscious."  Catlin then cut the bondage ropes from defendant's hands.

Dy woke up and got up from the ground.  He stumbled toward defendant and reached out.  Defendant put his arm around Dy and choked him, intending only to render Dy unconscious, until Catlin said, "'let him go.'"  At that point, Dy wasn't breathing.  Defendant took off his belt and started to strangle Dy again.  He did this "because he was dead and I know I killed him.  And I was mad at him, mad at myself. I knew I killed him and my life wouldn't be the same . . . ."

Defendant and Catlin put Dy's pants on and then moved Dy's body into the bathroom.  Catlin gave defendant a knife and told defendant to stab Dy.  Defendant stabbed Dy in the throat.  Defendant left the knife in Dy's throat and then stared at Dy for an hour.  He eventually took the knife out and gave it to Catlin.

. . . .

Defendant denied using the electrical cord to strangle Dy.  He explained why his blood was on the electrical cord, saying that he had cut himself with the belt.  The cord was in the bathroom, and blood got on it when defendant threw it into the hallway.

Defendant denied taking any items from Dy's apartment.  He became aware of the items in the trunk of the car after he and Catlin had driven back to San Francisco.  Catlin instructed defendant to pawn some of the items.  Defendant went to pawn the items while Catlin went to burn the bondage ropes.  Defendant never pawned the items, however.  He eventually put them back in the trunk of Dy's car.  At that point, he called Ray Sherer and met him.  Defendant gave Sherer some of the items.

Defendant acknowledged lying to the police during his interview in Colorado.  He explained that he lied about when he met Dy because he "didn't want to expose" his friend who ran the escort service.  He did not mention Catlin because he "felt like [he] owed the guy."

Defendant also acknowledged that he lied during his police interview in San Jose.  He blamed Catlin for the murder at that point, because he "didn't want to be blamed for it."

Defendant claimed that most of Riley Jones's testimony was untrue.  Another inmate in jail had suggested that defendant create written proof that Dy had given him permission to use the car.

**United States District Court**
For the Northern District of California

People v. Johnson, No. H023290, slip op. at 2-11 (Cal. Ct. App. August 1, 2003) (Resp. Ex. 6) (footnotes omitted).

B.    Procedural History

Johnson was convicted in a jury trial in Santa Clara County Superior Court of first degree murder and first degree robbery. Cal. Penal Code §§ 187, 211, 212.5. On June 22, 2001, Johnson was sentenced to a term of twenty-five years to life in prison. The California Court of Appeal affirmed the conviction. Johnson's petition for review was denied by the Supreme Court of California. Johnson also filed three unsuccessful habeas petitions in state court before filing this action.

In his federal habeas petition, Johnson asserted the following claims for relief concerning his conviction: (1) his constitutional right to present a defense was violated when the trial court refused to admit evidence about the victim's reputation for violent sex; (2)  his Sixth and Fourteenth Amendment rights to trial by jury and due process were violated by (a) the trial court's erroneous instructions that permitted the jury to find him guilty of robbery and felony murder even if he framed the intent after killing the victim, (b) the trial court's failure to give complete instructions on the principles of aiding and abetting, (c) the trial court's failure to instruct on theft as a lesser included offense, (d) the trial court's failure to give complete instructions on the theory of self defense, and (e) the trial court's use of CALJIC 17.41.1; and (3)  his Sixth Amendment right to effective assistance of counsel was violated by trial counsel's failure to request complete and accurate jury instructions on the issues of after-acquired intent, self-defense and antecedent threats.  The court issued an order to show cause why the petition should not be granted.  The parties have now briefed the claims and the petition is ready for a decision on the merits.

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over the petition for writ of habeas corpus under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged conviction occurred in Santa Clara County, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. 28 U.S.C. § 2254(b), (c). State judicial remedies have been exhausted for the claims presented in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas

court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." <u>Id.</u> at 409.

## DISCUSSION

A.  <u>Exclusion of Evidence of the Victim's Reputation for Violent Sex</u>

Johnson claims that his constitutional right to present a defense was violated when the trial court excluded evidence indicating that Dy (the victim) had a reputation for violent sex. This reputation was to be established using the testimony of River Sims, a minister who lived in the Polk Street and kept a "bad date journal" which he used to advise young male prostitutes working in the area about people for whom they might not want to provide services. RT 520. Sims would have testified that Dy was a "John who took guys home with him, who liked anal sex, and who plays it rough with sex." Cal. Ct. App. Opinion at 13. Johnson argued that Sims' testimony would support his theory of self-defense; that is, his actions were justified because he was responding to the threat of a "forcible and atrocious crime" such as rape or sodomy. Resp. Ex. 5 at 3 (citation omitted). The reputation evidence allegedly would have "established that Johnson strangled Dy because he was in fear of a *renewed* sexual assault by Dy" and would have "bolstered [Johnson's] credibility about the fact of the assault having occurred. . . ." Resp. Ex. 5 at 3-4.

The trial court stated that such a characterization of the victim was impermissible because it suggested the victim's tendency for a specific kind of act, as opposed to admissible "general" statements about reputation. Cal. Evid. Code § 1324. The court limited the evidence to broader categorizations of the victim as promiscuous or gay. As a result, Sims was not called to testify.

Both the Sixth and the Fourteenth Amendments give a criminal defendant the right to present a defense. <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986). The Supreme Court has held that under the Compulsory Process Clause of the Sixth Amendment "an accused has the right . . . to present his own witnesses to establish a defense. This right is a fundamental element of due process." <u>Washington v. Texas</u>, 388 U.S. 14, 19 (1967). In evaluating whether the exclusion of evidence violated a constitutional right, a court assesses the probative value, reliability, and

comprehensibility of the excluded evidence, whether the evidence is cumulative and whether it constitutes a significant portion of the attempted defense. <u>Chia v. Cambra</u>, 360 F.3d 997, 1004 (9th Cir. 2004). Even if the exclusion of evidence was a constitutional error, the erroneous exclusion must have had "a substantial and injurious effect" on the verdict for habeas relief to be granted. <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993).

The California Court of Appeal held that, even if the trial court had erred in excluding the evidence, any error was harmless. Cal. Ct. App. Opinion at 18. The court found that Johnson's credibility was damaged by the numerous lies he told when recounting the incident. By the time Johnson testified at trial, he was on his fifth telling of the story, yet had never before mentioned that Dy had attempted to sodomize him or that he acted in self-defense. <u>See</u> Cal. Ct. App. Opinion at 17. One indicator that Johnson's credibility was almost nil was the trial judge's comment at sentencing that he had made a note when Johnson testified during trial that it was "difficult to imagine a more deceptive, lying testimony being given and actually expecting a jury to believe such an obvious fabrication." RT 1085.

The state appellate court also considered that any error was harmless because, even if Sims had been allowed to testify that Dy had a reputation for violent sex, Johnson's testimony at trial did not provide sufficient evidence for the jury to find that Johnson killed Dy in self-defense. <u>Id.</u> For both perfect and imperfect self-defense under California law, the defendant must have an actual fear of "imminent harm. Fear of future harm - no matter how great the fear and no matter how great the likelihood of harm - will not suffice." Cal. Ct. App. Opinion at 17 (quotation marks and citations omitted). The appellate court explained that Johnson's testimony did not show him to have an actual fear of imminent harm when he choked Dy.

The court reached its decision by using the state-law "harmless beyond a reasonable doubt" standard that has been approved by the United States Supreme Court. <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967). This standard comports with federal law. <u>Medina v. Hornung</u>, 386 F.3d 872, 878 (9th Cir. 2004). Because this standard represents the correct standard on appeal, the Court of Appeal's decision was not "contrary to" clearly established federal law within the meaning of § 2254(d)(1). <u>See</u> <u>Williams</u>, 529 U.S. at 413.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

The Court of Appeal's application of clearly established federal law was reasonable, as well. Since the state court disposed of the constitutional error as harmless, the federal court must, for the purposes of the "unreasonable application" clause of § 2254(d)(1), determine whether the state court's harmless error analysis was objectively unreasonable. <u>Medina</u>, 386 F.3d at 878. In this case, the California Court of Appeal's harmless error analysis does not appear objectively unreasonable. First, Sims' testimony would not have been enough to establish that Johnson's trial testimony was credible. Sims had no personal knowledge of the events on the night Dy was killed, and only would have been providing reputation evidence that Dy had a reputation for violent sex. That might have corroborated the story Johnson told at trial, but the believability of Johnson's story was minimal even with corroboration that Dy had a reputation for enjoying violent sex because Johnson's current story differed from his earlier versions. Johnson had recounted the circumstances of the killing on four previous occasions without mentioning the attempted forcible sodomy. His story changed from his initial denial that he was present when Dy was killed (i.e., his first version for the police on September 18, 1999), to admitting that he was present when Dy was killed by someone else (i.e., his second version for the police on November 4, 1999), to stating he or his crime partner killed Dy to steal from him (i.e., his versions for a jail informant), to stating that he strangled Dy with a belt (i.e., his version for his friend Ray Sherer), to stating that he manually choked Dy after Dy attempted to sodomize him (i.e., his version at trial). In none of the pre-trial versions did he say that Dy had attempted to sodomize him.

Also, Johnson never claimed to have acted in self-defense in any of his prior statements. Johnson testified that, immediately after being untied, he felt "[u]pset maybe, mad, humiliated, embarrassed. . . ." RT 660. Johnson did not say he believed Dy was about to try to rape him when he acted. Further, the coroner determined that the cause of death was ligature strangulation, consistent with the belt found at the scene, which Johnson testified to using after he had choked Dy with his hands. Johnson testified at trial that he had used his belt to strangle Dy after he thought Dy was dead - - not because he was afraid or thought he needed to defend himself, but rather to express his anger with Dy. Cal. Ct. App. Opinion at 10. These actions are not consistent

1   with an actual belief in the need for self-defense.

2       Even Johnson's trial testimony did not show an actual belief he faced imminent harm. Dy
3   had just been rendered unconscious by Clay Catlin's efforts to strangle him. Dy had only barely
4   regained his senses when Johnson seized him. Johnson and Catlin outnumbered Dy. Johnson
5   outsized Dy by eleven inches in height and seventy-five pounds in weight. Johnson testified that
6   when Dy regained consciousness he was "swaying" and "stumbling" as if he was "dizzy[.]" RT
7   812-814. When asked directly what he thought would happen when Dy regained consciousness,
8   Johnson stated, "I don't really know, because I mean he is a small guy, I'm a big guy." RT 661;
9   see RT 813-814. The evidence showed Johnson did not actually believe he was going to be
10  assaulted when he strangled Dy.

11      The California Court of Appeal's decision was not an unreasonable application of, or
12  contrary to, clearly established federal law. The state court standard articulated the Chapman
13  standard, the correct standard of appellate review for constitutional errors, so it was not "contrary
14  to" clearly established federal law within the meaning of § 2254(d)(1). See Williams, 529 U.S.
15  at 413. The court did not unreasonable apply this standard. Johnson's theory of self-defense was
16  flawed. Johnson was not in a situation presenting imminent danger against which he believed it
17  was necessary to protect himself. Therefore, even if Sims' testimony regarding Dy's reputation
18  for engaging in violent sex had been admitted into evidence, it would not have altered the verdict.
19  Johnson is not entitled to relief on this claim.

20

21  B.   Instructional Error Claims

22      Johnson contends that his Sixth and Fourteenth Amendment rights to trial by jury and due
23  process were violated in five ways. First, he claims the trial court's instruction erroneously
24  allowed the jury to find him guilty of robbery and felony murder even if his intent to steal was
25  formed after he killed Dy. Second, he claims the trial court gave incomplete instructions on the
26  principles of aiding and abetting. Third, he urges the trial court failed to instruction on theft as
27  a lesser included offense. Fourth, he urges the trial court gave incomplete instructions on the
28  principles of self defense. Lastly, he claims CALJIC No. 17.41.1 was an unconstitutional

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   instruction.

2       To obtain federal habeas relief for errors in the jury charge, Johnson must show that "the

3   ailing instruction by itself so infected the entire trial that the resulting conviction violates due

4   process."  Estelle v. McGuire, 502 U.S. 62, 72 (1991).  The instruction may not be judged in

5   artificial isolation, but must be considered in the context of the instructions as a whole and the

6   trial record.  Id.  In other words, the court must evaluate jury instructions in the context of the

7   overall charge to the jury as a component of the entire trial process.  United States v. Frady, 456

8   U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)).

9

10          1.      Felony-Murder and Robbery Instructions

11      At Johnson's trial, the jury was instructed on felony-murder and robbery using  CALJIC

12   Nos. 9.40[1] and 8.21.[2]  Johnson argued that these instructions were ambiguous because they

13   permitted the jury to find him guilty of robbery and felony-murder even if he framed the intent

14   after the killing.  According to Johnson, this ambiguity was amplified by the prosecutor's closing

15   argument that, "during the commission of the underlying felony, if the killing occurs, then it is

16   first degree felony murder," and the "commission is only complete when they have left the

17

18

19          [1] CALJIC No. 9.40 was only slightly modified by the trial court when it instructed as follows:
    "The defendant is accused in Count 2 of having committed the crime of robbery, a violation of section
20   211 of the Penal Code.  [¶] Every person who takes personal property in the possession of another,
    against the will and from the person or immediate presence of that person, accomplished by means of
21   force or fear and with the specific intent permanently to deprive that person of the property, is guilty of
    the crime of robbery in violation of Penal Code section 211.  [¶] Immediate presence means an area
22   within the alleged victim's reach, observation or control so that he or she could, if not overcome by
    violence or prevented by fear, retain possession of the subject property.  [¶] Against the will means
23   without consent. [¶] In order to prove this crime, each of the following elements must be proved:  [¶]
    One, a person had possession of the property of some value, however slight;  [¶] Two, the property was
24   taken from that person or from his immediate presence;  [¶] Three, the property was taken against the
    will of that person;  [¶] Four, the taking was accomplished by either force or fear;  [¶] And Five, the
25   property was taken with the specific intent permanently to deprive that person of the property." RT
    1050-51.

26          [2] CALJIC No. 8.21 was used by the trial court when it instructed the jury as follows: "The
    unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during
27   the commission or attempted commission of the crime of robbery is murder of the first degree when the
    perpetrator had the specific intent to commit that crime.  [¶]  The specific intent to commit robbery and
28   the commission or attempted commission of that crime must be proved beyond a reasonable doubt." RT
    1039.

United States District Court
For the Northern District of California

1    apartment, and they have fled." RT 1020-21.

2        The California Court of Appeal disagreed. It found that "CALJIC Nos. 8.21 and 9.40

3    adequately cover the issue of the time of the formation of the intent to steal." Cal. Ct. App.

4    Opinion at 19 (citation omitted). Also, it viewed the prosecutor's statements as a fair response

5    to correct the defense counsel's inaccurate statement of law, and that the jury could not have been

6    misled by his closing argument. Cal. Ct. App. Opinion at 19.

7        In reviewing an ambiguous instruction, the court inquires whether there is a "reasonable

8    likelihood" that the jury has applied the challenged instruction in a way that violates the

9    Constitution. Estelle, 502 U.S. at 72 & n.4. Finding a reasonable likelihood establishes only that

10   an error has occurred. See Calderon v. Coleman, 525 U.S. 141, 146-47 (1998). If an error is

11   found, the court also must determine that the error had a substantial and injurious effect or

12   influence in determining the jury's verdict, see Brecht, 507 U.S. at 637, before granting relief in

13   habeas proceedings. See Calderon, 525 U.S. at 146.

14       Assuming arguendo the instructions were ambiguous, there is no reasonable likelihood that

15   the jury applied these instructions in an unconstitutional way at Johnson's trial. Not only did

16   CALJIC Nos. 9.40 and 8.21 represent a complete and correct statement of the law for the time

17   of formation of specific intent, the jury was also instructed with CALJIC No. 9.40.2.[3] The

18   California Court of Appeal explained that CALJIC No. 9.40.2 correctly stated the law in that it

19   "clearly informed the jury that defendant must have formed the specific intent to commit theft

20   before or at the time he committed the murder, especially when read in conjunction with CALJIC

21   9.40" because the latter required a taking from the victim's "immediate presence," which only

22   existed with respect to a person who was still alive because it required an area within the

23   "victim's reach, observation or control." Cal. Ct. App. Opinion at 22. Read together, these

24   instruct the jury that the defendant would not be guilty of robbery unless he formed "the specific

---

27       [3] CALJIC No. 9.40.2 was used by the trial court when it instructed the jury as follows: "To
constitute the crime of robbery, the perpetrator must have formed the specific intent to permanently
deprive an owner of his property before or at the time that the act of taking the property occurred. If
28   this intent was not formed until after the property was taken from the person or immediate presence of
the victim, the crime of robbery has not been committed." RT 1051.

intent. . . before or at the time" the taking occurred and the taking was such that the victim "could, if not overcome by violence or prevented by fear, retain possession of the subject property." Cal. Ct. App. Opinion at 22.  The jury could reasonably understand these instructions to only mean that Johnson had to have the specific intent to steal when applying the force that facilitated the taking in order to be guilty of robbery.

The prosecutor's statement also did not mislead the jury.  The prosecutor's statement was a fair response to defense counsel's misstatement of the law in his closing argument.  Defense counsel argued that the "felony had to precede the murder or the killing, it cannot follow it for the felony murder rule to apply." RT 997.  The suggestion that the robbery had to be complete before the killing "is an inaccurate statement of the law.  The prosecutor therefore explained that this was untrue and pointed out that the instruction 'doesn't say that the taking has to precede.' The prosecutor never argued that defendant could be convicted of felony-murder and robbery if he formed the specific intent to steal after committing the murder." Cal. Ct. App. Opinion at 24. The jury also had been instructed that the court's instructions prevailed over the attorneys' arguments.  See RT 1024.  ("If anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions.") Juries "are presumed to follow their instructions."  Richardson v. Marsh, 481 U.S. 200, 210 (1987).

The California Court of Appeal's determination that the jury was not misinstructed about the formation of the specific intent to steal was not contrary to, or an unreasonable application of, clearly established federal law.  Johnson is not entitled to relief on this claim.

2.   Aiding and Abetting Instructions

The jury was instructed on the liability of aiders and abetters using CALJIC No. 3.00[4],

---

[4] CALJIC 3.00 was used by the trial court when it instructed the jury as follows: "Persons who are involved in committing a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation, is equally guilty. Principals include, one, those who directly and actively commit the act constituting the crime, or, two, those who aid and abet the commission of the crime." RT 1037.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

which defines persons involved in the crime as principals regardless of whether they commit the crime directly or merely aid and abet its commission.  Johnson argues that the trial court's failure to instruct the jury with CALJIC 3.01, defining the terms "aiding" and "abetting", violated his constitutional right to due process.  The California Court of Appeal found a state law error in that either both CALJIC No. 3.00 and CALJIC No. 3.01, or neither, should have been given.  Cal. Ct. App. Opinion at 26.  Nevertheless, it determined that "it is clear defendant was not prejudiced," because the prosecution had proved that Johnson directly committed crime, and the prosecution had not proceeded on an aiding and abetting theory.  Id.

Regardless whether a state law error occurred in giving only CALJIC No. 3.00, Johnson was not actually prejudiced.  The California Court of Appeal explained that the "prosecution did not proceed on an aiding and abetting theory" but rather "sought to prove that defendant himself killed and robbed Dy."  Cal. Ct. App. Opinion at 27.  As the court reasoned, the failure to define a theory of liability that was not being argued did not affect the verdict in this case.  Id. Johnson's version of the events does not support an aider and abetter theory.  Johnson claimed to be completely unaware that Catlin took items from Dy's apartment until after he was driving back to San Francisco.  If that was believed, Johnson would not have had the "knowledge of the unlawful purpose of the perpetrator" or "the intent. . . of committing, encouraging, or facilitating the commission of the offense" necessary for him to be considered an aider and abetter.  Cal. Ct. App. Opinion at 26.  Additionally, even if Johnson had met the requirements for aiding and abetting, he would still be liable as a principal.  Id.  (citing CALJIC No. 3.00 for the proposition that "[p]rincipals include. . . those who aid and abet the commission of the crime").  The fact that neither the prosecution nor defense proceeded on an aiding and abetting theory supports the view that the instruction was irrelevant surplusage that had no likelihood of misleading the jury. Johnson also suffered no actual prejudice.  The decision of the California Court of Appeal was not "contrary to" or an unreasonable application of clearly established federal law within the meaning of § 2254(d)(1).  See Williams, 529 U.S. at 413.

United States District Court
For the Northern District of California

3.    Lesser Included Offense Instruction

Johnson argues the trial court's failure to instruct the jury on theft as a lesser included offense of robbery violated his constitutional right to a jury trial on "every material issue presented by the facts. . . ." Resp. Ex. 3 at 53.  At trial, defense counsel initially requested an instruction on theft as a lesser included offense of robbery, but later withdrew this request without any stated reason.  The California Court of Appeal found this constituted an "invited error" under state law.  Cal. Ct. App. Opinion at 27.  The trial court was relieved of its obligation to instruct on the lesser included offense because defense counsel, in making "a conscious, deliberate tactical choice," had "persuade[d] a trial court not to" instruct.  Id.

Johnson had no independent federal due process right to instructions on the lesser included offense under the law as set forth by the United States Supreme Court.  There is no clearly established rule that a trial court must instruct on all lesser included offenses.  Although instructions on lesser included offenses must be given in capital cases, Beck v. Alabama, 447 U.S. 625 (1980), "[t]here is no settled rule of law on whether Beck applies to noncapital cases such as the present one.  In fact, this circuit, without specifically addressing the issuing of extending Beck, has declined to find constitutional error arising from the failure to instruct on a lesser included offense in a noncapital case." Turner v. Marshall, 63 F.3d 807, 819 (9th Cir. 1995), overruled on other grounds, Tolbert v. Page, 182 F.3d 677 (9th Cir. 1999).  The failure of a state trial to instruct on lesser-included offenses in a non-capital case does not present a federal constitutional claim.  See Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000), cert. denied, 534 U.S. 839 (2001); Windham v. Merkle, 163 F.3d 1092, 1105-06 (9th Cir. 1998).

Under Ninth Circuit law, "the defendant's right to adequate jury instructions on his or her theory of the case might, in some cases, constitute an exception to the general rule." Solis, 219 F.3d at 929 (citing Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984).  Solis suggests that there must be substantial evidence to warrant the instruction on the lesser included offense.  See Solis, 219 F.3d 929-30 (no duty to instruct on voluntary manslaughter as lesser included offense to murder because evidence presented at trial precluded a heat of passion or imperfect self-defense instruction; no duty to instruct on involuntary manslaughter because evidence presented

at trial implied malice); see also Cooper v. Calderon, 255 F.3d 1104, 1110-11 (9th Cir. 2001) (no duty in death penalty cases to instruct on second degree murder as a lesser included offense because the evidence established that the killer had acted with premeditation, so if the jury found that the defendant was the killer, it necessarily would have found that he committed first degree murder).  Here, however, theft was not Johnson's theory of defense.  His defense vis-a-vis the items taken from Dy's apartment was that he did not even know items had been taken by his crime partner until he was driving back to San Francisco.  See RT 671-72.  That would not be a theft under California law because theft requires that the person have the specific intent to deprive at the time he takes the property.  See CALJIC No. 14.02.  These theory-of-defense cases do not apply because theft was not Johnson's theory of defense.

The failure to instruct on the lesser included offenses of theft did not violate any constitutional right Johnson possessed.  He is not entitled to the writ on this claim.

### 4.    Self-Defense Instructions

At Johnson's trial, the jury was instructed on the defense of justifiable homicide using CALJIC Nos. 5.12[5] (for perfect self-defense) and 8.45[6] (for imperfect self-defense).  The jury was also instructed using CALJIC 5.16, which read in relevant part: "[f]orcible sodomy is a forcible and atrocious crime."  RT 1047.  Johnson argues that the trial court's refusal to also instruct the jury pursuant to CALJIC Nos. 5.10 and 5.13 was a constitutional error.  These latter two instructions provide that a killing is justified if "committed by any person resisting an attempt to commit a forcible and atrocious crime" when there is "imminent danger of that crime being accomplished."  Resp. Ex. 3 at 59 (citations omitted).  The California Court of Appeal did not

---

[5] CALJIC No. 5.12 was used by the trial court when it instructed the jury as follows, in relevant part: "The killing of another person in self-defense is justifiable and not unlawful when the person who does the killing actually and reasonably believes, one, that there is imminent danger that the other person will either kill him or cause him great bodily injury. . . ."  RT 1046.

[6] CALJIC No. 8.45 was used by the trial court when it instructed the jury as follows, in relevant part: "Every person who unlawfully kills a human being without an intent to kill but in the actual but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury is" not guilty of murder.  RT 1043.

determine whether an error had occurred.  Instead, the court found that even if an error had occurred, that error was harmless beyond a reasonable doubt under <u>Chapman</u>.  Cal. Ct. App. Opinion at 29-30 (<u>citing</u> <u>Chapman</u>, 386 U.S. at 24).

The California Court of Appeal's decision was not an unreasonable application of, or contrary to, clearly established federal law.  The state court standard cited by the court mirrored the federal law standard, so it was not "contrary to" clearly established federal law within the meaning of § 2254(d)(1).  <u>See</u> <u>Williams</u>, 529 U.S. at 413.  Also, the court did not unreasonably apply this standard.  The California Court of Appeal used the same reasoning to find this alleged instructional error harmless that it had used to find harmless the refusal to admit evidence of the victim's reputation for violent sex.  That is, Johnson's testimony about Dy's attempt to commit forcible sodomy was not credible and, even if believed, Johnson's testimony did not provide evidence that he believed he faced any imminent peril at the time he killed Dy.  Cal. Ct. App. Opinion at 30; <u>see</u> <u>id.</u> at 17-18.  The state court correctly concluded that the failure to provide complete self-defense instructions was harmless.  As discussed in section A, above, Johnson did not face an imminent danger of being forcibly sodomized when he chocked Dy.  The failure to give these jury instructions did not have a substantial and injurious effect on the verdict.  He is not entitled to relief on this claim.

### 5.    Jury Nullification Instruction

Johnson next contends that the use of CALJIC No. 17.41.1 at trial violated his Sixth and Fourteenth Amendment rights to a jury trial and to due process.  CALJIC No. 17.41.1 instructs jurors to inform the court of other jurors' misconduct and potential misconduct.  Johnson's claim must be rejected in light of the Ninth Circuit's decision in <u>Brewer v. Hall</u>, 378 F.3d 952, 955-56 (9th Cir. 2004).  There, the court determined that "no Supreme Court case established that an instruction such as CALJIC 17.41.1 violates an existing constitutional right." <u>Id.</u> at 956.  Without such Supreme Court authority, relief cannot be granted under the standard in 28 U.S.C. § 2254(d).

**United States District Court**
For the Northern District of California

C.    Ineffective Assistance Of Trial Counsel Claims

Johnson urges that his Sixth Amendment right to effective assistance of counsel was violated by his trial counsel's failure to request complete and accurate jury instructions on (a) the after-acquired intent to steal, (b) self-defense, and (c) antecedent threats.

The Sixth Amendment right to counsel guarantees effective assistance of counsel. See Strickland v. Washington, 466 U.S. 668, 686 (1984). In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. Id. at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. See id. at 689.

The California Court of Appeal correctly identified Strickland as the governing Supreme Court case and correctly identified the test as a two-part one requiring both deficient performance and resulting prejudice. The court reasonably applied the Strickland test. The court rejected the claim that counsel erred in failing to request instructions regarding the timing of the intent to steal because the instructions that were given were adequate under state law. Cal. Ct. App. Opinion at 32. The court rejected the claim that counsel erred in failing to request two particular self-defense instructions for lack of showing a prejudice, i.e., the failure to given the instruction was not prejudicial and therefore counsel's failure to request them did not show ineffectiveness. The court rejected the claim that counsel was ineffective in failing to request a pinpoint instruction on the victim's antecedent threats (apparently referring to the victim's earlier alleged attempt to sodomize Johnson) for lack of showing prejudice: there was no evidence that Johnson honestly believed he was in imminent danger of being sodomized when he choked the victim. Id. at 33. There is no reasonable probability that the outcome would have been different if counsel had

made the arguments Johnson faults him for not making.  See Woodford v. Visciotti, 537 U.S. 19, 26-27 (2002).  Johnson is not entitled to the writ on his ineffective assistance of counsel claims.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  Petitioner's motion for an evidentiary hearing is DENIED because he has not shown a need for such a hearing.  (Docket # 19.)  The clerk shall close the file.

IT IS SO ORDERED.

DATED: June 30, 2008

_____
SUSAN ILLSTON
United States District Judge

**United States District Court**
For the Northern District of California